Statement of the Case.
MONROE, J.
Plaintiff sues to recover certain “articles,” described in Exhibit A, annexed to its original petition, alleging that they were loaned for temporary use, and it prays that in default of such recovery it have judgment for their value, which it places at $2,345.88. In its original petition, filed in March, 1907, it alleged that said articles had been loaned to Percival Stern, receiver of Spranley & Reed, Limited, and by him installed temporarily in defendant’s building. In June following, plaintiff’s counsel prepared an amended petition, of which defendant’s counsel accepted service, and in which it was alleged:
“That, in obedience to the order herein rendered by this honorable court, * * * directing the plaintiff to amend its petition, petitioner avers that during the months of October, November, and December, 1907, petitioner loaned to Percival Stern, receiver of Spranley & Reed, Limited, the articles * * * described in the exhibit annexed to the original petition herein as Exhibit A, and that the said loan was made verbally.”
On October 15th, defendant filed an answer, denying that the articles in question had been loaned to Percival Stern, receiver, or had been installed in its building, and alleging that, if they were so installed, it was because they had been sold by plaintiff to the Dilzell Engineering & Construction Company, Limited, or to Spranley & Reed, Limited, which concerns were under contract to put in the electrical appliances required in said building, and that plaintiff had guaranteed the execution of said contract; and there were further allegations which need not be recited at this time. Thereafter, on October 23d, plaintiff filed an amended petition, in which it alleged:
“That in the original petition filed herein it was inadvertently stated that petitioner loaned to Percival Stern, receiver of Spranley & Reed, Limited, the articles * * * described in the exhibit annexed to the original petition, * * * and that Percival Stem, receiver, installed said articles for temporary use in the building. * * * Now, your petitioner avers that, as a matter of fact, the said articles were loaned directly by your petitioner to the Maison Blanche, Limited, under the following circumstances, to wit: That during the months of October, November, and December, 1907, your petitioner was having constructed a certain electrical switchboard, and that about that time the Mai-son Blanche, Limited, needed a switchboard for temporary use, and that, upon the verbal re'quest of the representative of the said Maison Blanche, Limited, your petitioner loaned the said switchboard, the same being at the time of the value of $2,845.88 (a detailed statement of the various articles entering into said switchboard, and the value thereof, is set forth in Exhibit A, annexed to the original petition), to the said Maison Blanche, Limited, with the hope of later selling the same to either the Maison Blanche, Limited, or the contractor who was doing the electrical work on the building which the Maison Blanche, Limited, was erecting. * * * That it never made a sale of the said switchboard to the Maison Blanche, Limited, or to any one else, nor did it ever part with its title thereto. * * * ”
Defendant objected to the amendment, but its objection was overruled. From the evidence adduced on the trial, it appears that defendant made a contract with the Dilzell Engineering & Construction Company, Limited, whereby the latter agreed to install the electrical appliances required in the building which it (defendant) was erecting; *583 that about July 1, 1907, Spranley & Reed, Limited, acquired all tbe stock of tbe Dilzell Company, and took over its business, including tbe contract in question; that tbe Dilzell Company bad bought supplies for tbe purposes of said contract from tbe Interstate Electric Company, Limited, of which Percival Stern was general manager, and that Spranley & Reed, Limited, continued buying such supplies from tbe same concern; that in October, 1907 (say between tbe 9th and the 16th), Percival Stern was appointed receiver of Spranley & Reed, Limited, and undertook, by the authority of the court that appointed him, to go on with the contract with the defendant; that the Dilzell Company and Spranley & Reed, Limited, being indebted to the Interstate Company to a considerable amount, and the Maison Blanche, Limited, being indebted on its contract with those companies to the amount of $6,336, the Interstate Company requested the Maison Blanche Company to pay that amount to it, which the Maison Blanche, Limited, agreed to do, provided the Interstate Company would hold it harmless with respect to such payment, and would guarantee the complete execution of the contract; that the Interstate Company, by resolution of its board of directors, of date November 6, 1907, agreed to hold the Maison Blanche, Limited, harmless with respect to said payment, and further agreed:
“And guaranteed that the receiver of Spranley & Reed, Limited, will complete the contract, * * * provided payments are made to the receiver, under the contract, promptly as they mature.”
And that the $6,336 was paid to said Interstate Company. Thereafter, on November 10th, that company (by “E. Jumonville, Sec’y and Treas.”) wrote to Percival Stern, receiver, that it would furnish him with supplies with which to complete the contract in question, provided he would make payments on the 25th of each month for the purchases of the preceding month, and we infer that supplies were furnished accordingly, until, say, November 26th, when .the Interstate Company (by Jumonville, secretary and treasurer) again wrote to Stern, receiver, that, unless it received immediate payment for supplies which had been furnished during October, it would furnish no more, to which Stern replied that he had not been paid by the Maison Blanche, Limited, for the work done in October, and would pay the Interstate Company when he received his money.
On December 5th the Interstate Company wrote to the Maison- Blanche, Limited, saying, in effect, that it had guaranteed the completion of the contract, provided the payments were made thereunder promptly as they matured; that it had not been paid the amount due it by the receiver of Spranley & Reed, Limited, on November 25th, and had been informed that the receiver had not been paid by the Maison Blanche, Limited; that it had further been informed that objections had been raised to the work done by Spranley & Reed, Limited, and the Dilzell Company, before the appointment of the receiver, and also to the work done by the receiver.
“All this [the letter goes on to say] has led us to the conclusion that, after we, in good faith, advanced the receiver the necessary ma->, terial and cash to pay labor with which to compíete the contract, we may not be paid, owing the counterclaims that you may urge. When we agreed that the receiver would complete the contract, provided payments were máde to the receiver under the contract promptly as they matured, we knew the exact amount due under the contract, and had every right to believe you would make the payments to the receiver to the extent of the amount due. It now seems otherwise, and we are accordingly unwilling to proceed further, unless some satisfactory arrangement is concluded between us. * * * If you will agree to pay us promptly, on December 20th, for the amount of material and cash advanced for labor during the month of Nov., and agree further to pay us promptly, on the 20th of each succeeding month, for the material furnished and cash advanced for labor during the month previous, to an amount not exceeding the balance due under the contract, we will *585 advance the receiver the necessary material and cash for labor with which to complete the contract (after complete understanding is had regarding the work which is already done, as to whether it is satisfactory or not), although we are assured it will take more than this amount. Unless you agree to this, we will be justified in our conclusion that you do not intend to pay this amount, owing to the counterclaims which you intend to urge, and will go no further.”
On December 9tli the Maison Blanche, Limited, addressed a letter to the Interstate Company, reading in part as follows:
“We beg to hand you herewith copy of notice which we have sent to Mr. Pereival Stern, receiver. * * * We have taken this action as a result of a letter written by you, under date of December 5, 1907, which letter states that you will refuse to furnish any further material to the above-mentioned receiver, unless the same are guaranteed in advance, and unless certain possible objections to previous work are waived. You will recollect that, on the 6th day of November, 1907, you gave to the Blaison Blanche, Ltd., a certified copy of the minutes of your board of director’s meeting, held on Wednesday, Nov. 6, 1907. In this document, you guaranteed that the Interstate Electric Co., Ltd., would see' that the receiver of Spranley & Reed, Ltd., would complete the contract as mentioned above. It is evident that you do not intend to keep to your promise as stipulated, and therefore the receiver has been unable to properly carry on the electrical work on the above building; and hence we have been compelled to give him the necessary notice of default. * * * ”
The notice of default referred to appears to have been addressed to the Dilzejl Company and to Pereival Stern, receiver, on the same day, and reads in part as follows:
“On Oct. 16th, 1907, we received a written notice from Pereival Stern to the effect that he had been appointed receiver of the Spranley & Reed Co., Ltd. Since Oct. 16th, to the present date, Pereival Stern has been carrying on the contract as referred to above. During the week beginning Dec. 2nd, it became apparent upon the work on the above building that materials necessary for the performance of the above referred to contact were, not being promptly delivered, and the execution of the contract, therefore, from Dec. 2nd, 1907, has not been carried on properly, nor in conformity therewith.”
And the putting in default follows, after which the Maison Blanche, Limited, appears to have completed the work called for by. the contract, and, it is alleged, sustained a loss in so doing, for which it makes and reserves its claim against the surety of the contract- or, as also against the Interstate Company on its guaranty.
Mr. Stern testifies in effect that the articles which are here claimed form part of a switchboard, which in turn forms part of the electric installation in the building known as the Maison Blanche; that the Interstate Company sold said article with other electrical supplies to Spranley & Reed, Limited; that, being unable to make a satisfactory settlement of their indebtedness, Spranley & Reed, Limited, returned said articles (which he refers to as “the board,” or “switchboard”) to the Interstate Company some time in September. And he proceeds:
“We kept the board in our establishment for probably a month, or a little more. Realizing that the Maison Blanche was in course of construction, and that this would be desirable to them, the Interstate Electric Company sent the-board to the receiver of the Spranley & Reed-Company, Limited. By Mr. Merrick: When? A. During October; the latter part of October. By Mr. Lemle: Eor what purpose? A. They had the only switchboard building established: in New Orleans — to be worked on and completed. The Interstate Electric Company figured for such and concluded that the Maison Blanche contract would need that switchboard, and wo would be in a position to sell it to them, because these instruments were special, and required at least four or five months to manufacture, and they could not wait that long. Q. How did it get to the Maison Blanche? A. Mr. Gordon, who was the engineer for James Stewart & Co., who represented the Maison Blanche, came to my store. - * * Mr. Gordon came to the Interstate Electric Company, and stated that the temporary switchboard which had been used by the Maison Blanche up to that time was heavily overloaded, and had burned out, and it was necessary to have this board down there at once. * * * Q. Mr. Stem, when was it that this switchboard was sent down to the Maison Blanche? * * * A..Oh, somewhere in November. * * * I said, as near as I coulc] remember, some time during November. * * * Q. Was it in the beginning or the end of the month? A. I can’t answer that question. Q. Why do you select the month of November out of all the months of the year A. Because some time in the latter [part] or the middle of October the Interstate Electric Company sent the board to the receiver to have the board completed, and the board was in the receiver’s shop some time.”
At another place he was asked, “What is a ‘600 ampere circuit breaker?’ ’’ and he an *587 swered that he could not say offhand. And his testimony proceeds:
“Q-. The article mentioned in this petition, who was that furnished by? A. I furnished it from the articles of Spranley & Reed. Q. Does it represent the articles that were not paid for in connection with the switchboard? A. Yes, sir. Q. And these prices that Spranley & Reed paid for them? A. They are not paid for the prices at which it was originally charged for them, and they gave us quotations from the various supply houses. Q. These articles — in connection with that, will you state whether the Maison Blanche has paid any one for them? A. No, sir. Q. Were they ever charged .direct to the Maison Blanche, and paid for by the Mai-son Blanche? A. No, sir.”
The contract with the Dilzell Company was signed, on behalf of defendant, “Maison Blanche, Limited, by James Stewart & Company, Managers of Construction, by J. H. Erederickson,” and the letters putting in default were signed: “Maison Blanche, Limited, James Stewart & Company, Managers of Construction. W. 'Smith.” Walter Smith testified that he was empioyed by James Stewart & Co., and that he had the supervision of the entire work of construction of the Maison Blanche, and the handling of all matters relating to subcontractors, material, workmen, etc. 1-Ie further testifies as follows:
“Mr. Stern and myself had various conferences with reference to the balance of the switchboard work and equipment. They were of a monetary nature, which was never agreed to, •■as we claimed that the Interstate Electric 'Company had no right to this board, inasmuch :as the same had been the property of Spranley ,& Reed at the time they failed, and that inasmuch as the Interstate Company had guaranteed to complete this Spranley & Reed defaulted contract, we insisted that the board was our property, and must be delivered to us without additional charge, and this was finally done. * * * Mr. Gordon had no authority from James Stewart & Co. uj)on the Maison Blanche to purchase any material, or to agree to any expenditures whatever; Mr. Gordon acted in the capacity of advisory engineer to the architects.”
Opinion.
Pursuant to the agreement expressed in the resolution adopted by plaintiff's board of directors, on November 6, 1907, the Maison Blanche, Limited, paid to- the Interstate Company, through Percival Stern, its general manager, the $6,336 due under its contract with the Dilzell Company, which contract Percival Stern, as receiver of Spranley & Reed, Limited, was engaged in carrying out. As a result of that agreement, Percival Stern became further interested in the carrying out of the • contract in question, not only in his capacity as receiver of the contractor, but as general manager of the guarantor of the contractor, who, upon the conditions stated in the agreement, had obligated itself to furnish the contractor with the material required for the completion of the contract. If it be true that in that condition of affairs Percival Stern was informed by Gordon, or any one else, that the switchboard, which his contractor had installed in tne building, being heavily overloaded, had burned out, and that there was urgent need to supply its place, and, if it be true that he had at that time in his possession and under his control, in his double capacity of receiver of the contractor and general manager of the contractor’s guarantor and furnisher of material, a switchboard, or the material for constructing a switchboard, that would answer the purpose, the obvious thing for him to have done would have been to use such switchboard, or such material, to supply the need, since he would thereby have been complying with the contract, which he represented as receiver, and with the guaranty, which he represented as general manager. The theory propounded in the original petition, and in the supplemental petition, which was prepared some three months later, but not filed, was that the general manager “loaned” to the receiver certain “articles” already in the possession of the receiver, and always intended to be used for the purposes of a switchboard for the Maison Blanche, which articles were to be installed in that building, and, in com *589 bination with other articles, converted temporarily into a switchboard, such as the 'contract and the guaranty, represented by the receiver and the general manager, called for. If, however, one should loan to a contractor who is building a house, for which he is also furnishing the material, a barrel of sand, to be used in the building, he could hardly expect to recover it out of the house, .or from the owner of the house, and still less could he expect to do so if he had guaranteed the execution of the building contract. The lender in such case would probably look to the borrower alone, and we are inclined to think that he would have to do sq in the case presented by plaintiff’s original petition and supplemental petition, submitted to defendant’s counsel three months later, but not filed. The amended petition, filed seven months after the original petition, alleges, as we have stated, that the “articles were loaned directly * * * to the Maison Blanche, Limited, * * * up-an the verbal request of the representative of said Maison Blanche,” and at a time when such a board was needed for temporary use.
The question which here suggests itself is: Why should either the receiver of Spranley & Reed, Limited, or the Maison Blanche, Limited borrow, for temporary use, articles which the lender was bound, by interest •and contract, to furnish for permanent use, .and which had been especially provided with a view to such use? For, be it remembered, the date of the alleged loan, according to the testimony of Mr. Stern, must have been between the 6th and the 26th of November, a period during which the contract and guaranty were both in full force. Mr. Stern does not however, testify that Mr. Gordon, whom he names as the representative of the Maison Blanche, Limited, or rather of James Stewart & Co., asked that any “article” be loaned for temporary use. In fact, it does not appear that Mr. Gordon knew of the existence of the “articles.” What Mr. Stern testified to is tnis:
“Mr. Gordon came to the Interstate Electric Company, and stated that the temporary small board, which had been used by the Maison Blanche up to that time, was heavily overloaded, and had burned out, and that it was necessary to have this board down there at once.”
If Mr. Gordon had been the authorized representative of the Maison Blanche, Limited, he might very well have sought Mr. Stern at' ,, the office of the Intel state Electric Company; but it would not have followed that a request or demand, made upon him under the contract, which, as the receiver of the Spranley & Reed Company, Limited, he had undertaken to carry out, would have been addressed to him in his capacity as general manager of the Interstate Company. The fact is, Mr. Gordon was not the representative of the Maison 'Blanche, Limited, nor of James Stewart & Co., and had no authority in the premises; and Mr. Stern does not allude to Mr. Smith, or to the testimony of that gentleman, to the effect that the question of the switchboard was discussed between them, and that the result of the discussion was that, the switchboard was delivered to the Maison Blanche, Limited, “without additional charge.”
On the schedule annexed to the petition, defendant is charged with “1.60.0 amp. 2 poll, 1 coil I. T. A. circuit breaker, $140,” and yet, as we have seen, Mr. Stern says in his testimony:
“I furnished it from the articles of Spranley & Reed.”
He further says that none of the articles which appear upon the schedule were charged to the Maison Blanche, Limited. Why the Interstate Electric Company should make a charge for an article furnished from the stock of Spranley & Reed, and why it should fail to charge the Maison Blanche, Limited, for articles furnished directly to *591 that company, from Its (the Interstate Company’s) own stock, is not explained.
[1, 2] In view of the facts stated and the evidence adduced, our conclusion is that the theory of the “loan” propounded by the plaintiff is not sustained by the proof, and that the articles sued for must be held to have been installed in the Maison Blanche according to contract, and to be beyond the reach of the claim here set up. Whether the Maison Blanche, Limited, failed to make the payments called for by its contract, and whether it was justified in demanding that the .other party to said contract proceed with its execution, are matters that cannot be considered here, since the other party is not before the court. The original defendant, the “Maison Blanche, Limited,” went into liquidation before the judgment was rendered in the district court, and there was substituted in its place the “Maison Blanche Company.”
The judge a quo rejected plaintiff’s demand and dismissed its suit, and that judgment is affirmed.